1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GIOVANNI HUIPIO,

            Plaintiff,

    v.

CITY OF SAN JOSE, et al.,

            Defendants.

Case No.  21-cv-07838-SVK

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 46

On the evening of September 22, 2019, San Jose police officers responded to a call from a woman who reported that her husband, Plaintiff Giovanni Huipio, had physically attacked her near their home.  The officers' search of Plaintiff's home ultimately led them to a locked shed in the backyard.  The officers pried open the door of the shed and found Plaintiff lying on his back in a confined space with his hands up.  Officer Michael Jeffrey deployed a police dog, who bit Plaintiff on the ankle.  Officer Jeffrey then grabbed the police dog by the collar and dragged Plaintiff out of the shed while the dog was still biting his ankle.  On August 4, 2020, Plaintiff filed a lawsuit against the City of San Jose and several police officers, which Defendants subsequently removed to this Court.  Dkt. 1.  Following the Court's order granting in part and denying in part Defendants' motion to dismiss (Dkt. 22), Plaintiff filed a First Amended Complaint (Dkt. 23 - "FAC").  All Parties have consented to the jurisdiction of a magistrate judge.  Dkt. 5, 7.

Now before the Court is Defendants' motion for summary judgment.  Dkt. 46.  The Court held a hearing on June 27, 2023.  After considering the arguments in the briefing and hearing on the motion, the relevant law, and the case file, and for the reasons explained below, the Court **GRANTS** summary judgment in favor of Defendants Bret Hatzenbuhler, Brandon Orlando, and Michael Jeffrey on Plaintiff's claim for excessive force on the grounds that those Defendants are entitled to qualified immunity.  By agreement of Plaintiff, the Court also **DISMISSES** all of

Plaintiff's claims against Defendants Jeffrey Profio, Dustin Burnett, and Steven Gaona and **DISMISSES** Plaintiff's remaining state claims against all Defendants for violation of the Bane Act and intentional infliction of emotional distress.

# I.      BACKGROUND

## A.      Factual Background[1]

On September 23, 2020, Plaintiff and his wife had a disagreement near their home.  Huipio Decl. ¶ 2.  Plaintiff's wife threatened to call the police.  *Id.* ¶ 3.  Plaintiff then returned home, where he used methamphetamine and alcohol.  *Id.* ¶¶ 3-4.  Plaintiff states that he became "increasingly paranoid and fearful" after using these substances.  *Id.* ¶ 5.  He then left his room, went into the backyard, went inside a small shed, and laid down between two large slabs of drywall-type material that were almost the length of his body, with his feet at the door of the shed. *Id.* ¶¶ 6-8.

Meanwhile, Plaintiff's wife had called the San Jose Police Department, and police were dispatched to Plaintiff's home regarding a barricaded suspect in a domestic violence dispute. Burnett Decl. ¶ 3.  When Sergeant Dustin Burnett arrived at Plaintiff's home, he was told that Plaintiff had physically attacked his wife by pushing her, pulling her hair, and biting her on the cheek, prompting her to call police.  *Id*. ¶ 4.  Burnett was also informed that Plaintiff had threatened to kill his wife with a knife the day before, had an outstanding warrant for felony domestic violence, was threatening to commit suicide when the victim refused to lie in court about a previous domestic violence incident, and had previously attempted suicide and threatened that he would commit suicide by forcing the police to kill him.  *Id.*  Burnett was also told that Plaintiff frequently carried a knife or box cutter for work.  *Id.*  While on the scene, Burnett learned that Plaintiff sent text messages to his wife and son stating that he was going to commit suicide.  *Id.* Burnett instructed other officers on the scene to conduct announcements for Plaintiff to exit the

---

[1] This statement of facts is based primarily on declarations submitted by Plaintiff (Dkt. 48-1 – "Huipio Decl."); declarations submitted by Defendants Sergeant Dustin Burnett (Dkt. 46-1 – "Burnett Decl."), Officer Steven Gaona (Dkt. 46-2 – "Gaona Decl."), Sergeant Bret Hatzenbuhler (Dkt. 46-4 – "Hatzenbuhler Decl."), Sergeant Brandon Orlando (Dkt. 46-6 – "Orlando Decl."), and Officer Michael Jeffrey (Dkt. 46-8 – "Jeffrey Decl."); and the amended declaration submitted by former Lieutenant Jeffrey Profio (Dkt. 47 – "Am. Profio Decl.").

United States District Court
Northern District of California

home and surrender.  *Id.* ¶ 5.  Announcements continued from patrol vehicles in front of the home and a helicopter for over an hour, but Plaintiff did not comply.  *Id.*  An officer also tried to contact Plaintiff by cell phone multiple times, but he did not answer.  *Id.*

Burnett also determined that the support from the Canine Unit and Violent Crime Enforcement Team ("Canine Unit") was warranted because Plaintiff was barricaded, was potentially armed, and had exhibited a tendency for violent behavior.  *Id.* ¶ 6.  Once the Canine Unit was on the scene, an arrest team was formed, consisting of Sergeant Bret Hatzenbuhler, Sergeant Brandon Orlando, Officer Steven Gaona, and Officer Michael Jeffrey, as well as officers from the Violent Crime Enforcement Team (VCET) and patrol officers.  *Id.* ¶ 7; Hatzenbuhler Decl. ¶ 7; Am. Profio Decl. ¶ 9.  Burnett shared the information he had about Plaintiff with several members of the arrest team.  Burnett Decl. ¶ 7; *see also* Gaona Decl. ¶ 4; Hatzenbuhler Decl. ¶ 9; Orlando Decl. ¶ 8; Jeffrey Decl. ¶ 10.

The arrest team devised a plan to enter the home and take Plaintiff into custody. Hatzenbuhler Decl. ¶ 12.  A perimeter was established around the property in case he tried to escape.  *Id.*  Meanwhile, announcements were already being made in English and Spanish and were ongoing.  *Id.*; Orlando Decl. ¶ 7; Jeffrey Decl. ¶ 12.   The plan included having a police canine ready to deploy if needed to help locate or apprehend Plaintiff.  Hatzenbuhler Decl. ¶ 12; Orlando Decl. ¶ 10; Jeffrey Decl. ¶ 12.  Jeffrey Profio, who was at the time lieutenant of the Canine Unit, was on scene and agreed with the plan, including the canine deployment. Hatzenbuhler Decl. ¶ 12; *see also* Am. Profio Decl. ¶¶ 7, 10.

Once the door to the home was open, multiple loud warnings were given that the police dog would be released if Plaintiff did not come out and would bite the suspect if found, but Plaintiff again did not respond.  Hatzenbuhler Decl. ¶ 13; Orlando Decl. ¶ 11; Jeffrey Decl. ¶ 13. Initially, Orlando's canine was deployed into the home to search for Plaintiff, with the arrest team following closely behind.  Hatzenbuhler Decl. ¶ 13; Orlando Decl. ¶ 11; Jeffrey Decl. ¶ 13.  After a short time, Jeffrey's canine, "Tex," replaced Orlando's canine to help continue the search. Hatzenbuhler Decl. ¶ 13; Orlando Decl. ¶ 11; Jeffrey Decl. ¶ 13.  While searching the residence, the arrest team did not locate Plaintiff.  Hatzenbuhler Decl. ¶ 14.  However, they located a large, bloody knife in the bathroom sink.  Hatzenbuhler Decl. ¶ 14; Jeffrey Decl. ¶ 13.

1    The arrest team expanded its search to the backyard of the property.  Hatzenbuhler Decl.

2    ¶ 15; Jeffrey Decl. ¶ 16.  In the backyard, they located two large sheds.  Hatzenbuhler Decl. ¶ 16;

3    Orlando Decl. ¶ 13; Jeffrey Decl. ¶ 17.  On one of the shed doors, Orlando observed several small

4    holes that appeared to be from a small caliber firearm.  Orlando Decl. ¶ 13.  He communicated this

5    to other members of the arrest team.  *Id.*; Hatzenbuhler Decl. ¶ 16; Jeffrey Decl. ¶ 17.  No

6    additional announcements were given in the backyard.  Hatzenbuhler Decl. ¶ 17.  The officers

7    attribute this decision to their concern that additional announcements might jeopardize officer

8    safety because they thought Plaintiff might be armed.  *Id.*; Jeffrey Decl. ¶ 22.

9    Officers attempted to open the shed door with the holes in it, but it was locked.

10   Hatzenbuhler Decl. ¶ 18; Jeffrey Decl. ¶ 18.  A Halligan (large metal tool) was used to pry the

11   door open.  Hatzenbuhler Decl. ¶ 18; Jeffrey Decl. ¶ 18.  Hatzenbuhler and Orlando maintained

12   firearm coverage of on the doorway as it was opened.  Hatzenbuhler Decl. ¶ 22; Orlando Decl. ¶

13   14.  Upon the door to the shed opening, police found Plaintiff.  Hatzenbuhler Decl.¶ 21.

14   Tex, the police canine, was trained to locate a suspect and bite and hold the suspect until

15   Jeffrey gave the command to release.  Jeffrey Decl. ¶ 7.  As the door to the shed was opening,

16   Jeffrey simultaneously deployed Tex to locate Plaintiff.  *Id.* ¶ 24; Hatzenbuhler Decl. ¶ 21;

17   Orlando Decl. ¶ 17.  Tex bit Plaintiff in the left ankle area through Plaintiff's leather work boot.

18   Jeffrey Decl. ¶ 25.

19   Once the shed door was opened, the officers assessed the situation.  Hatzenbuhler

20   Decl.¶ 22; Orlando Decl. ¶ 17; Jeffrey Decl. ¶ 24.  As mentioned above, inside the shed Plaintiff

21   was laying on his back on the floor between two large slabs of drywall-type material that were

22   almost the length of his body, with his feet at the door of the shed.  Huipio Decl. ¶¶ 6-8.  The shed

23   was also cluttered with other items.  Hatzenbuhler Decl.¶ 21; Orlando Decl. ¶¶ 18-19; Jeffrey

24   Decl. ¶ 25.  The officers concluded that they were unable to enter the shed to take control of

25   Plaintiff.  Hatzenbuhler Decl.¶ 23; Orlando Decl. ¶ 19; Jeffrey Decl. ¶ 26.  Jeffrey, who did not

26   have his weapon drawn during these events, pulled Tex's harness while his bite was engaged,

27   which pulled Plaintiff from the shed.  Jeffrey Decl. ¶ 26; Hatzenbuhler Decl.¶¶ 22, 23; Orlando

     Decl. ¶ 19.

28   Once Plaintiff was outside the shed and officers grabbed his hands, Jeffrey removed Tex

4

from the bite.  Jeffrey Decl. ¶ 27; Hatzenbuhler Decl.¶ 24; Orlando Decl. ¶ 20.  The total time between deploying Tex and removing him from the bite was approximately 20-25 seconds. Jeffrey Decl. ¶ 28.

The events in the shed were captured on the body-worn cameras of Sergeant Hatzenbuhler, Sergeant Orlando, and Officer Jeffrey.  Hatzenbuhler Decl. ¶ 15 and Ex. D; Orlando Decl. ¶ 12 and Ex. A; Jeffrey Decl. ¶ 16 and Ex. A.

After his removal from the shed, Plaintiff was placed in handcuffs.  Orlando Decl. ¶ 20; Jeffrey Decl. ¶ 28.  Plaintiff was transported to the hospital for medical care.  Hatzenbuhler Decl.¶ 25; Orlando Decl. ¶ 22; Jeffrey Decl. ¶ 29.  Plaintiff states that he was given a boot to wear and a walker at the hospital and later used a cane while recovering.  Huipio Decl. ¶¶ 23-24.  He received an ankle injection and had follow-up appointments.  *Id.* ¶ 26.  Plaintiff's opposition to the motion for summary judgment also refers to receiving "surgical intervention and debridement" and having a possible chip fracture.  Dkt. 48 at 5, 8.

Plaintiff was subsequently booked into jail for felony domestic violence, assault with a deadly weapon, brandishing a knife, criminal threats, intimidating a witness, and resisting arrest. Hatzenbuhler Decl.¶ 26; Orlando Decl. ¶ 23; Jeffrey Decl. ¶ 30.  Plaintiff was later convicted in state court and sentenced to prison after pleading guilty to felony infliction of corporal injury and inducing false testimony by force.  *See* Dkt. 46-9.[2]

### B.    Procedural Background

Plaintiff originally filed this action in state court on August 4, 2020.  *See* Dkt. 1. Defendants subsequently removed the action to this Court.  *Id.*  The original Complaint named as Defendants the City of San Jose ("City") as well as police officers Michael Jeffrey, Jeff Profio, Bret Hatzenbuhler, Melissa Villasenor, Brandon Orlando, Dustin Burnett, and Steven Gaona. Dkt. 1-1 at Ex. A.  The causes of action in the original Complaint alleged a violation of the Bane

_____

[2] Together with the motion for summary judgment, Defendants filed a request that the Court take judicial notice of a certified copy of the felony abstract of judgment against Plaintiff from Santa Clara County Superior Court, dated October 27, 2020.  Dkt. 46-9.  Plaintiff has not opposed Defendants' request for judicial notice.  Court records are properly the subject of judicial notice. *See Roca v. Wells Fargo Bank*, No. 15-cv-02147-KAW, 2015 WL 2598749, at *4 (N.D. Cal. Sep. 29, 2015); *see also* Fed. R. Ev. 201(b)(2).  Accordingly, Defendants' request for judicial notice (Dkt. 46-9) is **GRANTED**.

United States District Court
Northern District of California

1    Act (Cal. Civ. C. § 52.1) and intentional infliction of emotional distress. *Id.* Following removal,

2    Defendants filed a motion to dismiss, which Plaintiff opposed. Dkt. 8, 10. The Court granted the

3    motion to dismiss in part and gave Plaintiff leave to amend. Dkt. 22.

4        Plaintiff subsequently filed the First Amended Complaint. Dkt. 23 – "FAC." The FAC

5    names as Defendants the City as well as police officers Jeffrey, Profio, Hatzenbuhler, Orlando,

6    Burnett, and Gaona. *Id.* The FAC contains claims for excessive force under 42 U.S.C. § 1983,

7    violation of the Bane Act, and intentional infliction of emotional distress. *Id.* Defendants filed

8    answers to the FAC. Dkt. 24-30. Following discovery, Defendants filed the motion for summary

9    judgment now before the Court, which Plaintiff opposes. Dkt. 46 (Motion), 48 (Opposition), 49

10   (Reply).

## II.    SUMMARY JUDGMENT LEGAL STANDARD

12       Summary judgment may be granted only when, drawing all inferences and resolving all

13   doubts in favor of the nonmoving party, there is no genuine dispute as to any material fact. Fed.

14   R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp. v. Catrett*, 477 U.S.

15   317, 322 (1986). A fact is material when, under governing substantive law, it could affect the

16   outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about

17   a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for

18   the nonmoving party." *Id.* Bald assertions that genuine issues of material fact exist are

     insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

19       The moving party bears the burden of identifying those portions of the pleadings,

20   discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*,

21   477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go

22   beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that

23   a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*,

24   897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir.

25   1983)).

26       At summary judgment, where there is videotape evidence of the incident in question, the

27   Court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372,

28   381 (2007). However, "the mere existence of video footage of the incident does not foreclose a

1    genuine factual dispute as to the reasonable inferences that can be drawn from that footage."

2    *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018), cert. denied, 139 S. Ct. 2613

3    (2019).

4    **III.   DISCUSSION**

5        **A.    Plaintiff's narrowing of claims and defendants**

6        In his opposition to Defendants' motion for summary judgment, Plaintiff narrowed his

7    claims as follows:

8        • Plaintiff agreed to dismiss his third cause of action for intentional infliction of

9            emotional distress; and

10       • Plaintiff agreed to dismiss all claims against the following individual Defendants:

11           Jeff Profio, Dustin Burnett, and Steven Gaona.

12   Dkt. 48 at 28.  Accordingly, the Court **DISMISSES** Plaintiff's third cause of action for intentional

13   infliction of emotional distress against all Defendants and **DISMISSES** all claims against

14   Defendants Profio, Burnett, and Gaona.

15       The Court will now turn to Plaintiff's remaining claims against the City and the remaining

16   individual Defendants:  Hatzenbuhler, Orlando, and Jeffrey (collectively, the "Officers").

17       **B.    First Cause of Action – Excessive Force (42 U.S.C. § 1983)**

18           **1.    Legal standards**

19               **a.    Excessive force**

20       Plaintiff's first cause of action alleges that the Officers violated 42 U.S.C. § 1983 by

21   unreasonably using excessive force against Plaintiff, thereby depriving him of his Fourth

22   Amendment right to be secure against unreasonable searches and seizures.  FAC ¶¶ 82-88.[3]

23   A Fourth Amendment claim of excessive force is analyzed under the framework set forth in

24   *Graham v. Connor*, 490 U.S. 386 (1989).  Under *Graham*, the Court must balance "the nature and

25   quality of the intrusion on the individual's Fourth Amendment interests against the countervailing

26   _____

27   [3] Plaintiff originally asserted this claim against all individual Defendants:  Jeffrey, Profio,
     Hatzenbuhler, Orlando, Burnett, and Gaona.  Dkt. 23.  As discussed in section III.A. above,
     Plaintiff has agreed to drop his claims against Defendants Profio, Burnett, and Gaona.

28

governmental interests at stake." *Id.* at 396 (internal quotation marks and citations omitted); *see also Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). The government's interest in the use of force is assessed by considering three primary but nonexclusive factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396; *see also Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003). The "most important" of these factors is whether the individual posed an immediate threat. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). Other factors, in addition to the three *Graham* factors, may also be pertinent in deciding whether a use of force was reasonable under the totality of the circumstances. *Nehad v. Browder,* 929 F.3d 1125, 1137 (9th Cir. 2019); *see also Kingsley v. Hendrickson,* 576 U.S. 389, 397 (2015); Ninth Circuit Model Civil Jury Instruction 9.25. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

### b.    Legal standard – qualified immunity

The Officers have raised a qualified immunity defense to Plaintiff's excessive force claim. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Qualified immunity exists to shield an officer from liability for "mere mistakes in judgment, whether the mistake is one of fact or one of law." *Butz v. Economou*, 438 U.S. 478, 507 (1978). "[A]t summary judgment, an officer may be denied qualified immunity in a Section 1983 action only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Longorio v. Pinal Cnty.*, 873 F.3d 699, 704 (9th Cir. 2017) (internal quotations marks and citations omitted). A court may use either prong of the qualified immunity test as the starting point.

1   *Hopson v. Alexander*, No. 21-16706, -- F.4th --, 2023 WL 4038631, at *3 (9th Cir. June 16, 2023).

2   Although the court must "assum[e] that the version of the material facts asserted by the [plaintiff]

3   is correct," it may consider facts offered by the defendant that are "uncontradicted by any evidence

4   in the record." *Id.* (citations omitted).

5   **2.      Duration of canine bite**

6          Plaintiff's excessive force claim in the FAC contains allegations concerning both the initial

7   deployment of the police canine to bite Plaintiff while he was lying in the shed and the

8   continuation of the bite until Plaintiff had been dragged out of the shed by the canine.  *See, e.g.,*

9   FAC ¶¶ 59-62.  However, in his opposition to Defendants' motion for summary judgment,

10  Plaintiff clarifies that although "there is case law both ways regarding the initial use" of the police

11  dog, "the basis of his claim regarding the dog bite is about the prolonged duration."  Dkt. 48 at 21.

12  Accordingly, Plaintiff's claim for excessive force is based not on the initial <u>deployment</u> of the

13  canine, but instead on the alleged <u>prolonged duration</u> of the bite.  *See id.*

14         On the first *Graham* factor used in evaluating whether force is excessive—the severity of

15  the intrusion on Plaintiff's Fourth Amendment rights—the Officers contend that the force in this

16  case was moderate, although they argue that even if the use of force is considered a serious

17  intrusion it was nonetheless justified.  Dkt. 46 at 11.  On the second *Graham* factor—the

18  importance of the government's interest in the use of force—Plaintiff concedes that the first

19  subfactor is satisfied because he was accused of the serious crime of domestic violence.  Dkt. 48 at

20  10.  Plaintiff acknowledges that "it was alleged that [he] had threatened his wife, been involved in

21  domestic violence, alleged that he had a weapon, and that he was suicidal."  *Id.*  Plaintiff also

22  concedes that "[t]hese allegations were conveyed to the Defendants, who had probable cause to be

23  at the subject property and to arrest [Plaintiff]."  *Id.*  Plaintiff disputes the second and third

24  subfactors concerning the government's interest, arguing that he did not pose an immediate threat

25  of harm to the Officers because he had "physically surrendered before the Officers even opened

26  the shed door" and at that point was only "passively resisting."  *Id.* at 15-17.

27         In light of the Parties' disagreement over whether the use of force was excessive in this

28  case, the Court begins its analysis with the Officers' qualified immunity defense because even if

United States District Court
Northern District of California

1   there is a disputed issue of material fact as to whether there was a constitutional violation

2   involving the duration of the canine bite, the Officers are not liable if they are entitled to qualified

3   immunity.  On the qualified immunity issue, the Court exercises its discretion to first consider

4   whether the constitutional right at issue in this case was clearly established at the time of the

5   incident.  *See Hopson*, 2023 WL 4038631, at *3; *see also Niesen v. Garcia*, No. 2:14-2921 WBS

6   CKD, 2016 WL 4126382, at *5 (E.D. Cal. July 5, 2016) ("After considering the difficulty of the

7   Fourth Amendment question in this case, the court finds that this is the type of case the Supreme

8   Court had in mind when it determined that a court may assume the existence of a constitutional

9   violation on the first inquiry and then determine whether the constitutional right was clearly

10   established" (citations omitted)).  The Court will therefore assume, without deciding, that the

11   duration of the dog bite violated Plaintiff's Fourth Amendment right and determine whether the

12   unlawfulness of the Officers' conduct was "clearly established" at that time.  *See Pearson*, 555

13   U.S. at 231; *Hopson*, 2023 WL 4038631, at *3.

14        The Ninth Circuit recently explained that "a constitutional violation is clearly established

15   only if existing law placed the constitutionality of the officer's conduct beyond debate, such that

16   every reasonable official would understand that what he is doing is unlawful."  *Hopson*, 2023 WL

17   4038631, at *4 (quoting *Dist. of Columbia v. Wesby*, -- U.S. --, 138 S. Ct. 577, 589 (2018), and

18   *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted); *see also*

19   *Hernandez v. Town of Gilbert,* 989 F.3d 739, 743-44 (9th Cir. 2021).  "This demanding standard

20   protects all but the plainly incompetent or those who knowingly violate the law."  *Hopson*, 2023

21   WL 4038631, at *4 (internal quotation marks and citations omitted).  The Court's analysis of this

22   issue "must be from the perspective of a 'reasonable officer on the scene' and 'allo[w] for the fact

23   that police officers are often forced to make split-second judgments—in circumstances that are

24   tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

25   situation."  *Longoria v. Pinal Cnty*., 873 F.3d 699, 704 (9th Cir. 2017) (citations omitted).

26        The Court may not "define clearly established law at a high level of generality, since doing

27   so avoids the crucial question whether the official acted reasonably in the particular circumstances

28   that he or she faced."  *Hopson*, 2023 WL 4038631, at *4 (quoting *Wesby*, 138 S. Ct. at 590).

United States District Court
Northern District of California

10

Although "a case directly on point" is not required, a rule is clearly established only if it has been "settled" by "controlling authority" or "a robust consensus of cases of persuasive authority" that "clearly prohibit[s] the officer's conduct in the particular circumstances" with "a high degree of specificity." *Hopson*, 2023 WL 4038631, at \*4 (quoting *Wesby*, 138 S. Ct. at 589–90). These guideposts have "special relevance in the Fourth Amendment context" because "Fourth Amendment violations generally, and excessive force claims more specifically, can involve situations in which the results depend very much on the facts of each case," which "can make it difficult for officers to know in advance whether their actions will be found unlawful." *Hopson*, 2023 WL 4038631, at \*4 (internal quotation marks and citations omitted). "Plaintiffs asserting excessive force claims must thus point to an existing rule that squarely governs the facts at issue and moves the officer's actions outside the hazy border between excessive and acceptable force." *Id.* (internal quotation marks and citations omitted).

In conclusion, to defeat the Officers' qualified immunity defenses, Plaintiff must show that under the state of the law on September 22, 2019, a reasonable officer would understand that the duration of the dog bite in this case was unconstitutional. *See Hopson*, 2023 WL 4038631, at \*4; *see also Hernandez*, 989 F.3d at 744 (state of the law on the relevant date must have given a reasonable officer "fair warning" that using a police dog in the way alleged was unconstitutional).

### a.    Cases denying qualified immunity

As of the date of the dog bite in this case, September 22, 2019, Ninth Circuit law provided that permitting a canine to bite an arrestee may constitute excessive force under certain circumstances. *See, e.g., Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998); *Chew v. Gates*, 37 F.3d 1432 (9th Cir. 1994).

In *Watkins*, the Ninth Circuit held that allowing a police canine to bite a "helpless" suspect who was "surrounded by police officers with their guns drawn" was excessive force and unconstitutional under clearly established law. *Watkins*, 145 F.3d at 1093. In that case, officers and a police canine responded to a silent alarm at a commercial warehouse. The officers saw Watkins running within a building, and there was no evidence as to whether he was armed. An

officer claimed that he announced that he would release a police dog who would bite Watkins unless Watkins surrendered, although Watkins denied hearing the announcement. Watkins did not surrender. The officer released the police dog to conduct a search, and the dog located Watkins hiding in a car and bit him on the foot. Upon reaching the car, the officer did not immediately call the dog off of Watkins but instead ordered Watkins to show his hands. Watkins failed to comply. The officer then pulled Watkins out of the car to the ground. The dog continued to bite until Watkins complied with the officer's orders to show his hands. The dog bite lasted approximately 30 seconds. Watkins sustained injuries due to the bite, including multiple lacerations and punctures as well as a puncture deep enough that tendons were exposed. The Ninth Circuit affirmed the district court's denial of the officer's motion for summary judgment on qualified immunity. *Watkins*, 145 F.3d at 1093. The court held that "it was clearly established that excessive duration of the bite and improper encouragement of the attack by officers could constitute excessive force that would be a constitutional violation." *Id.*

In *Chew*, a police officer stopped Chew for a traffic violation. Chew fled from the officer on foot and hid in a scrapyard. The officer had not searched him for weapons. Upon discovering there were three outstanding warrants for Chew's arrest, the officer radioed for assistance. Among those dispatched to assist in the search of the scrapyard were an officer and his police dog. The officer unleashed the dog, which ultimately found Chew crouching between two metal bins. The dog bit Chew several times and then seized him. There was a dispute about events immediately after the dog bit Chew, including whether Chew resisted the dog and whether the officer ordered the dog to continue the attack after Chew asked officers to call off the dog. The Ninth Circuit reversed the district court's order granting summary judgment to the City, finding that "the question whether it was reasonable under the Fourth Amendment for [the officer] to release [the dog] was for the jury." *Chew*, 27 F.3d at 1443.

Several decisions by district courts in the Ninth Circuit discuss the principles established by these earlier Ninth Circuit decisions. At the hearing, the City argued that district court cases are not binding on this court and cannot serve as authority for denying qualified immunity. However, the Supreme Court has stated that a rule can be clearly established if it has been

1     "'settled' by 'controlling authority' or '*a robust consensus of cases of persuasive authority*' ...."

2     *Wesby*, 138 S. Ct. at 589 (emphasis added).  Accordingly, the Court has considered *Koistra v.*

3     *Cnty. of San Diego*, 310 F. Supp. 3d 1066 (S.D. Cal. 2018) and *Steinmeier v. Cnty. of San Diego*,

4     2020 WL 377052 (S.D. Cal. Jan. 23, 2020), both cited by Plaintiff, and *Rosenbaum v. City of San*

5     *Jose*, No. 20-CV-04777-LHK, 2021 WL 245185 (N.D. Cal. Dec. 23, 2021), cited by Defendants.

6     In *Koistra*, the district court denied summary judgment on a canine officer's qualified immunity

7     defense, finding that earlier cases including *Watkins* "provided notice that a canine officer cannot

8     continue to use canine against someone, like [the plaintiff]" for an additional 30 seconds after she

9     "had surrendered by putting her arms up and asserted she was unarmed."  *Koistra*, 310 F. Supp. 3d

10     at 1084.  The district court in *Steinmeier* also denied summary judgment on a canine officer's

11     qualified immunity defense, stating that "cases clearly establish that it is unlawful for an officer to

12     strike a suspect while she is on the ground handcuffed, or while being handcuffed, and not posing

13     an immediate threat to officers or the public." *Steinmeier*, 2020 WL 377052, at *11.  *Rosenbaum*

14     involved a motion to dismiss, and the district court held that the plaintiff had plausibly alleged a

15     claim for unconstitutionally excessive force under clearly established Fourth Amendment law

16     where the complaint alleged that "[o]fficers released a dog to bite and hold Plaintiff for more than

17     twenty seconds despite the fact that Plaintiff lay on his stomach with his hands outstretched, was

18     in full view of officers with their firearms pointed at Plaintiff, was only wearing a tank top and

19     cotton sweatpants, and did not appear to be armed."  *Rosenbaum*, 2021 WL 245185 at *32, 40.

20        A recent Ninth Circuit opinion[4] that considered the state of the law on duration of police

21     canine bites as of May 5, 2016, which was before the biting incident in this case, summarized the

22     parameters established by these earlier cases as follows:  "Our caselaw is clear that an officer

23     cannot direct a police dog to continue biting a suspect who has fully surrendered and is under the

24     officer's control."  *Hernandez*, 989 F.3d at 745 (citing *Watkins*, 145 F.3d at 1093 and *Koistra*, 310

25     F. Supp. 3d at 1082-84); *see also Smith v. City of Hemet*, 394 F.3d 689, at 704 n.7 (9th Cir. 2005)

26

27     —————————————

      [4] "While courts generally don't consider post-incident cases in determining whether the law was

28     clearly established at the time of the incident[,] … post-incident cases that make a determination regarding the state of the law at the time of the incident are persuasive authority."  *Hernandez*, 989 F.3d at 745 n.3.

United States District Court
Northern District of California

(stating that it is clearly established that "excessive force has been used when a deputy sics a canine on a handcuffed arrestee who has fully surrendered and is completely under control" (citing *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994)).

### b.      Cases granting qualified immunity

Other Ninth Circuit cases regarding police canine incidents that predate the one in this case have held that the duration of a police canine bite is not excessive where the suspect is not yet under the officers' control.  *See, e.g., Hernandez*, 989 F.3d 739; *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017) (en banc); *Miller v. Clark Cnty.*, 340 F.3d 959 (9th Cir. 2003); *Mendoza*, 27 F.3d 1357.

The Ninth Circuit's 2021 decision in *Hernandez* post-dated the canine bite in this case but it involved an incident on May 5, 2016 and discussed whether relevant law was "clearly established" as of the date of that incident.  989 F.3d at 744.  Hernandez was suspected of driving under the influence.  Following a brief chase by a police officer, Hernandez drove to his home, opened the garage, and pulled inside.  While remaining in the car, Hernandez tried to activate his remote-controlled garage door opener but the officer stopped the door from closing.  Backup officers arrived along with a police dog.  The officers gave repeated warnings to Hernandez to step out of the car and ultimately warned a dog would bite him if he did not do so.  He repeatedly refused.  Not knowing whether Hernandez was armed, two officers approached the car with guns drawn.  One officer tried to force Hernandez out of the car using control holds and pepper spray, but Hernandez resisted.  An officer then commanded his police dog to bite Hernandez.  The dog entered the car and bit Hernandez.  Officers again ordered Hernandez to exit the vehicle but he did not do so.  After 36 seconds, the canine officer ordered the canine to release his bite, and the dog obeyed 14 seconds later by releasing Hernandez's arm, but he held onto Hernandez's shirt for an additional 22 seconds before completely releasing the hold.  Ultimately the officers successfully pulled Hernandez from the car.  The Ninth Circuit affirmed the district court's order granting summary judgment on the ground of qualified immunity.  *Hernandez*, 989 F.3d at 747.

In *Lowry*, San Diego Police Department officers and a police dog searched a commercial

United States District Court
Northern District of California

building at night after a burglar alarm was triggered.  They found a door to a darkened office suite propped open but were unable to see inside.  They made two announcements to come out or else a police dog would be sent in and might bite, but no one responded.  The dog was then released from her leash and officers followed closely behind her as they scanned each room.  As an officer entered one of the rooms, he noticed a person laying down on a couch.  The dog leaped on the couch and bit the person's lip, and within seconds the officer called off the dog, who returned to the officer's side.  The person on the couch (Lowry) worked in the office and had accidentally triggered the alarm when returning after a night out drinking with friends.  Lowry sued the City, which had a policy and practice of training police dogs to locate and control persons on command by finding a person, biting them, and holding that bite until an officer commands the dog to release the bite.  The City policy was that police dogs could be left on the bite "until the suspect can be handcuffed by the handler and be safely taken into custody."  The district court granted summary judgment in favor of the City, and the Ninth Circuit, sitting en banc, affirmed, holding that use of the police dog under these circumstances did not violate Lowry's constitutional rights. *Lowry*, 858 F.3d at 1253.  In conducting the *Graham* balancing analysis, the court found the use of force to be moderate.  *Id.* at 1257.  The court then evaluated the City's interest in the use of force, explaining that whether the suspect posed an immediate threat to the safety of the officers or others is "the most important single element of the three specified factors" in determining the government's interest.  *Id.* at 1258.  The court concluded that "objectively menacing circumstances" existed because they were dispatched to respond to a burglar alarm, they arrived quickly to find a dark commercial building and an open door, and no one responded to their warning, from which "a reasonable officer could have concluded that if there was someone committing a burglary in the building, that person might be armed and could pose an immediate threat to the safety of the officers."  *Id.*  Based on these circumstances, as well as the fact that the crime of burglary is serious and other factors including that warnings were given and the conceivable alternatives to use of the police dog posed risks to the officers, the Court concluded that the officers had a "compelling interest in protecting themselves against foreseeable danger in an uncertain situation."  *Id.* at 1258-1260.  Balancing the gravity of the intrusion against the City's

1   need for that intrusion, the Court concluded that use of the police dog under the circumstances of

2   that case did not violate Lowry's rights under the Fourth Amendment. *Id.* at 1260.

3          In *Miller*, a patrol officer attempted to pull over a vehicle with a switched license plate but

4   the driver refused, he drove to the entrance to a long driveway, and a passenger exited the car.

5   The patrol officer pursued the passenger, while the driver proceeded up the driveway towards a

6   house.  The patrol officer called for backup.  A sheriff's deputy arrived soon thereafter with a

7   police dog.  The deputy learned that the plaintiff in the case, Miller, lived in the house and was

8   wanted on a felony charge of attempting to flee the police by driving a car with a wanton or willful

9   disregard for the lives of others.  The deputy was told by other deputies that that residents of the

10  house were not "law enforcement friendly" and that a mentally ill person lived there.  He was also

11  told that Miller had been seen running away from the house a few minutes earlier.  The deputy

12  saw a seven or eight-inch knife on the car seat.  The deputy and his police dog, along with another

13  officer, tracked Miller across the large rural property before arriving at some dense, dark, wooded

14  terrain.  The deputy stopped and announced that Miller had five seconds to make himself known

15  or a police dog would be sent to find him.  When there was no response, the deputy let the dog off

16  his leash and gave him a command that directed the dog to search for the suspect and detain him

17  by biting his arm or leg.  About one minute later, he heard Miller scream.  The deputy

18  immediately ran into the woods in the direction of the scream, but because it was dark and the

19  woods were unfamiliar to him, it took the deputy 45 to 60 seconds to arrive at a location where he

20  could see Miller.  He saw that Miller was unarmed and that the police dog was biting Miller's

21  upper arm.  The deputy ordered the dog to release the bite, and the dog promptly complied.  Miller

22  was severely injured, with skin tears and shredded muscles, requiring surgery and several days in

23  the hospital and causing lingering effects.  The Ninth Circuit affirmed the district court's

24  judgment, entered after a bench trial, holding that the deputy's use of the dog was not excessive

25  force.  *Miller*, 340 F.3d at 963.  In conducting the *Graham* balancing analysis, the court first

26  decided that the intrusion on Miller's Fourth Amendment interests was serious given that the

27  deputy "permitted the dog to bite and hold Miller for an unusually long time period" which "might

28  cause a suspect pain and bodily injury." *Id.* at 964.  Next, the court assessed the importance and

16

legitimacy of the government's countervailing interests and found that the relevant factors—the severity of Miller's crimes, whether Miller threatened the officer's safety, and whether Miller was actively resisting arrest or attempting to evade arrest by flight—favored the government. *Id.* at 964-966. The court then balanced these interests and concluded that the force that was applied was reasonably necessary under the circumstances. *Id.* at 966. Of particular note, the Ninth Circuit stated with respect to the duration of the dog bite that if the dog had been ordered to release Miller before the deputy arrived at the scene, "Miller might have had a chance to hide or flee anew, to recover a weapon, to harm the dog, or to prepare to launch an ambush against the detectives." *Id.* at 968. Accordingly, the court concluded that the deputy's use of the police dog "to bite and hold Miller until deputies arrived on the scene less than a minute later was a reasonable seizure that did not violate Miller's Fourth Amendment rights."

The Ninth Circuit's 1994 decision in *Mendoza* involved a suspect who was severely bitten by a police canine while attempting to evade arrest for robbing a bank. *Mendoza*, 27 F.3d at 1358. The suspect, Mendoza, fled the scene of the bank robbery in his car, then abandoned the car and fled on foot for about half a mile before hiding under some bushes for several hours. By tracing the license place on the abandoned car, sheriff's deputies learned that Mendoza had previously been jailed for another bank robbery, and a radio transmission from police headquarters warned the officers that Mendoza might be armed. The parties disputed whether police had warned Mendoza that he was surrounded and that a dog might be deployed. A police dog bit Mendoza. Although the parties' versions of the facts diverged, Mendoza claimed, among other things, that the dog bit down on his right arm, dragged him from the bushes, and kept biting him even after the deputy handling the dog put a gun to his head and eventually handcuffed him. The officers claimed that Mendoza struggled with the dog and resisted being handcuffed. Following an evidentiary hearing, the district court held that the deputy handling the dog had behaved reasonably under the circumstances and that the deputies were therefore entitled to qualified immunity as a matter of law. *Id.* at 1359. The Ninth Circuit affirmed. The court recognized that on the "clearly established" prong of the qualified immunity doctrine "no particularized case law is necessary for a deputy to know that excessive force has been used when a deputy sics a canine

17

on a handcuffed arrestee who has fully surrendered and is completely under control," *Id.* at 1362. Nevertheless, the court found no error in the district court's determination that the deputies' conduct was objectively reasonable, given that the district court found (based on the facts developed at the evidentiary hearing) that Mendoza was fleeing arrest for felony bank robbery, the deputies believed he was armed, he did not surrender when warned, he was hiding on private property where he could have posed a danger to the property owners, and he struggled even after he was bitten by the dog. *Id.* at 1362-1363.

### c.    Analysis

As this extensive discussion of case law regarding police canine bites demonstrates, it was clearly established at the time of the dog bite in this case that the use of canine force against a suspect who has "fully surrendered and is under the officer's control" may violate the Constitution. *Hernandez*, 989 F.3d at 745 (citing *Watkins*, 145 F.3d at 1093 and *Koistra*, 310 F. Supp. 3d at 1082-84). Meanwhile, allowing a police canine to maintain a bite on the suspect before that point had been found not to constitute excessive force. *See Hernandez*, 989 F.3d at 745 and cases cited therein. The Ninth Circuit explained this spectrum in *Hughes v. Rodriguez* in discussing whether an officer involved in a December 2017 incident was entitled to qualified immunity: if the officer's use of a police canine had stopped once suspect was subdued "he would certainly be entitled to qualified immunity under our precedents in *Hernandez, Miller,* and *Mendoza*" but he was not entitled to qualified immunity for "post-handcuff beating and dog-biting". 31 F.4th 1211, 1224 (9th Cir. 2022). What is not so clear from the cases, however, is the point at which suspect can be considered to have "fully surrendered" and be "under the officer's control."

In considering whether it is appropriate for the Court to rule on the Officers' qualified immunity defenses on summary judgment, the Court must bear in mind that qualified immunity is a question of law, not a question of fact and "ordinarily should be decided by the court long before trial." *Hunter v. Bryant,* 502 U.S. 224, 228 (1991); *Torres v. City of Los Angeles,* 548 F.3d 1197, 1210 (9th Cir. 2008). The issue should be submitted to the jury only when "historical facts

18

1   material to the qualified immunity determination are in dispute." *Torres*, 548 F.3d at 1211. "If

2   the only material dispute concerns what inferences properly may be drawn from the historical

3   facts, a district court should decide the issue of qualified immunity." Comment to Ninth Circuit

4   Model Civil Jury Instruction 9.34 (citing *Conner v. Heiman,* 672 F.3d 1126, 1131 n.2 (9th Cir.

5   2012).

6          Here, there is no genuine dispute as to many of the material facts pertaining to Plaintiff's

7   arrest. Plaintiff admits that his wife called the police about a domestic violence incident, he used

8   methamphetamine and alcohol after returning home, and he was paranoid and fearful. Huipio

9   Decl. ¶¶ 2-5. Plaintiff does not dispute that the Officers knew these facts, nor does he dispute that

10  the police found a knife in the house and bullet holes in the shed where he was hiding. *See*

11  *generally id.* Plaintiff admits that he hid from the police while they looked for him and that that

12  he had long drywall-like slabs on either side while he laid in the shed. *See id.* ¶¶ 6-8. Meanwhile,

13  the Officers do not dispute that Plaintiff kept his hands up while being bitten by the police canine.

14  *See generally* Hatzenbuhler Decl. ¶ 22; Orlando Decl. ¶ 18; Jeffrey Decl. ¶ 25. Even if the

15  Parties' versions of events are not entirely identical, however, the Court must determine qualified

16  immunity on the basis of the facts viewed in the light most favorable to Plaintiff. *Longorio*, 873

17  F.3d at 704.

18         Plaintiff attempts to avoid summary judgment by arguing that he fully surrendered or was

19  under the officer's control before Jeffrey ordered the police canine to release the bite. *See* Dkt. 48

20  at 13. However, whether Plaintiff "surrendered" or "was under the officers' control" is not a

21  purely factual question that must be viewed in his favor as the non-moving party; instead, it is a

22  determination that depends on inferences to be drawn from facts regarding the conduct of

23  Plaintiffs and the Officers. *See Hernandez*, 989 F.3d at 747 (affirming grant of summary

24  judgment on basis of qualified immunity to officer, holding that plaintiff "fails to meet his burden

25  to show a genuine issue of material fact as to whether he surrendered" because "a reasonable

26  officer would not view [plaintiff's] conduct as an act of surrender.")

27         The evidence in some cases may be sufficient to "conclusively show[]" whether the

28  plaintiff had surrendered. *See, e.g., id.* In this case, however, the Court need not reach a definitive

1    conclusion as to when Plaintiff surrendered or was under the Officers' control because the issue

2    key to a determination of qualified immunity is whether existing precedent placed "beyond

3    debate" that the decision to allow the canine to maintain his bite until he pulled Plaintiff from the

4    shed and officers gained control of his hands and arms was unconstitutional.  *See Hernandez*, 989

5    F.3d at 744.  As explained above the particular circumstances are highly relevant to excessive

6    force claims in general, and to excessive force claims involving police canines specifically.  *See*

7    *Hopkins*, 2023 WL 4038631, at *4; *see also Lowry*, 858 F.3d at 1256 ("Our precedent establishes

8    that characterizing the quantum of force with regard to the use of a police dog depends on the

9    specific factual circumstances").  Again, the Court acknowledges that Plaintiff is not required to

10   identify a "case on all fours" finding excessive force under exactly the circumstances of this case

11   that are discussed above.  *Hernandez*, 989 F.3d at 744.  However, the Court must consider the

12   "specific context" of this case.  *Id.* at 745.

13          The relevant context in this case at the time the Officers encountered Plaintiff is set forth in

14   section I.A. above and includes their knowledge that:  (1) Plaintiff was being pursued for an

15   incident of domestic violence in which he physically attacked his spouse on that very day; (2)

16   Plaintiff had an outstanding court case for domestic violence; (3) Plaintiff had threatened to kill

17   his spouse with a knife the day before; (4) Plaintiff may have been armed given that Officers

18   found a large bloody knife in his home and bullet holes in the door of the shed where he was

19   hiding, and Plaintiff carried a knife or box cutter for work; (5) Plaintiff was suicidal and had

20   threatened to commit suicide by provoking the police to kill him; (6) Plaintiff had a history of

21   substance use; (7) Plaintiff had not surrendered even after hours of police announcements; (8)

22   Plaintiff was found hiding in a small, cluttered shed with his arms and hands up, feet at the door of

23   the shed, and large drywall-type items close to each side stretching almost the length of his body;

24   and (9) several officers stood at the door of the shed when it was opened, some with weapons

25   drawn, and they illuminated Plaintiff and the interior of the shed, but they were unable to enter the

26   shed to gain control of Plaintiff's arms or hands.  *See* Burnett Decl. ¶ 4; Hatzenbuhler Decl. ¶ 9;

27   Orlando Decl. ¶ 8; Jeffrey Decl. ¶ 10; *see generally* section I.A. above. The Officers state that they

28   feared for their safety.  Jeffrey Decl. ¶¶ 11, 20; Orlando Decl. ¶ 9; *see also* Hatzenbuhler Decl. ¶

United States District Court
Northern District of California

20

29.

These circumstances distinguish this case from the cases discussed above in which courts have determined that the duration of a canine bite may violate a suspect's constitutional rights. Indeed, although the burden is on Plaintiff and not the officers to identify earlier cases that clearly establish the constitutional parameters at issue, the circumstances of this case more closely resemble those in cases where courts have granted qualified immunity. For example, in *Miller*, the suspect was wanted for a serious crime, the officers did not know where he was hiding or if he was armed, the terrain was familiar to the suspect but not the officers, and the suspect "remained defiant" despite the officers' warnings. In that case, the Ninth Circuit held that these circumstances were "objectively menacing" and that the canine officer was therefore entitled to assume that the suspect posed an immediate threat to the officers' safety. *Miller*, 340 F.3d at 965. To be sure, the circumstances of these two cases are not precisely the same. The police canine in *Miller* was ordered to release the bite once officers saw the suspect was not armed, although the duration of the bite was longer than this case. However, the Officers here had additional information not at issue in *Miller*, including that Plaintiff was suspected for domestic violence on this and other occasions, was suicidal, and was found in a confined space that the Officers were unable to enter to control Plaintiff's hands or arms.

In light of the totality of these circumstances, the Officers' actions in this case remain within the "hazy border" between acceptable and unacceptable force. *See generally Hopson*, 2023 WL 4038631, at *4. Accordingly, Plaintiff has not carried his burden of establishing that existing case law at the time of the police canine bite in this case clearly established that a reasonable officer would know that the duration of the dog bite was unconstitutional. Accordingly, the Court **GRANTS** summary judgment in favor of Defendants Hatzenbuhler, Orlando, and Jeffrey on the grounds of qualified immunity.

### 3. Other excessive force arguments

The FAC alleges that all of the Officers engaged in excessive force (*see* FAC ¶ 83), and Plaintiff's opposition to the motion for summary judgment similarly argues that the prolonged use of the canine bite by "Defendants" was excessive (*see, e.g.,* Dkt. 48 at 17), without distinguishing among the remaining three Officer Defendants: Hatzenbuhler, Orlando, and Jeffrey. All three Officers are entitled to qualified immunity as to the duration of the canine bite for the reasons discussed in the preceding section.

Plaintiff also argues in opposition to summary judgment that Defendants Hatzenbuhler and Orlando were integral participants in the alleged constitutional violation. Dkt. 48 at 19-20; *see also* FAC ¶ 85. In the Ninth Circuit, "integral participants in" a constitutional violation may be held liable for that violation even if those participants did not "directly engage in the unconstitutional conduct themselves." *Hopkins v. Bonvicino,* 573 F.3d 752, 770 (9th Cir. 2009). Even assuming that Defendants Hatzenbuhler and Orlando were integral participants (rather than directly engaged along with Defendant Jeffrey, the dog's handler) in the alleged unconstitutional conduct concerning the duration of the canine bite, they would be entitled to qualified immunity for the same reasons discussed in the preceding question. *See generally Niesen*, 2016 WL 4126382, at *12.

Plaintiff's opposition to the motion for summary judgment states that Defendants Hatzenbuhler and Orlando "also used excessive force and caused Mr. Huipio additional harm after the canine bite when they forced him to stand up on his injured leg/ankle and made him walk to the front yard, causing additional pain." Dkt. 48 at 20; *see also* Huipio Decl. ¶ 20. To the extent Plaintiff seeks to assert a section 1983 excessive force claim based on this alleged conduct by Defendants Hatzenbuhler and Orlando, the Court finds that this claim was not raised in the FAC. The FAC catalogs Plaintiff's excessive force claims as follows:

> Mr. Huipio was ultimately subjected to various forms of excessive force, with the initial dog attack being the first, the unnecessary and prolonged bite being the second, the forced drag of the shed through the use of razor-sharp teeth as a pulley mechanism being the third, the focus of loaded firearms on him causing further fear of violence while he was being dragged and bitten was the fourth, and the use of aggressive arm contortions while being bitten and further injuring his leg was the fifth.

1    FAC ¶ 71.  As discussed in section III.B.2. above, Plaintiff clarifies elsewhere in his opposition

2    that "the basis of his claim regarding the dog bite is about the prolonged duration."  Dkt. 48 at 21.

3          The FAC did not put Defendants on notice that Plaintiff would assert that the actions of

4    Hatzenbuhler and Orlando in making him stand and walk on his injured leg/ankle was an

5    independent act of excessive force.  Instead, the FAC's discussion of those Defendants' actions

6    focuses on their use of "arm contortions."  *See* FAC ¶ 18 ("Defendants Orlando and Hatzenbuhler

7    contorted and twisted Mr. Huipio's arms and moved his body in a reckless manner such that Mr.

8    Huipio suffered further pain from the canine attack.  Specifically, the K-9 was still actively biting

9    him as they contorted his arms to handcuff him"); *id.* ¶ 65 (same); *id.* ¶ 71 (referring to

10   "aggressive arm contortions").  Accordingly, Plaintiff cannot avoid summary judgment by

11   attempting in his opposition to state a new theory for his excessive force claim, particularly where

12   he has provided no supporting evidence or case law to support that theory.  *See Wasco Prod., Inc.*

13   *v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is

14   not a procedural second chance to flesh out inadequate pleadings.").

15         Accordingly, the Court's conclusion in the preceding section that Defendants

16   Hatzenbuhler, Orlando, and Jeffrey are entitled to summary judgment on the basis of qualified

17   immunity disposes of Plaintiff's section 1983 claim in the FAC in its entirety.

18

19        **C.**       **Second Cause of Action – Bane Act (Cal. Civ. C. § 52.1)**

20         Plaintiff's second cause of action alleges that the City and the Officers violated

21   California's Bane Act.  FAC ¶¶ 89-95.[5]  The Bane Act, California Civil Code § 52.1, provides a

22   private cause of action against anyone who "interferes by threat, intimidation, or coercion, or

23   attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any

24   individual or individuals of rights secured by the Constitution or laws of the United States, or of

25   the rights secured by the Constitution or laws of [California.]"  Cal. Civ. Code § 52.1(a).

26

27   [5] Plaintiff originally asserted this claim against the City and the Officers.  Dkt. 23.  As discussed in

28   section III.A. above, Plaintiff has agreed to drop this and all other claims against Defendants Profio, Burnett, and Gaona.

*United States District Court*
*Northern District of California*

1    Defendants argue that if Plaintiff's section 1983 claim is decided in their favor, the Court should

2    decline subject matter jurisdiction over Plaintiff's remaining state law claims.  Dkt. 46 at 23.[6]

3          Having granted summary judgment on Plaintiff's sole federal claim, the Court, in its

4    discretion, declines to assert supplemental jurisdiction over the Bane Act Claim.  A district court

5    may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has

6    original jurisdiction.  *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (citing 28

7    U.S.C. § 1367(c)(3)).  Where, as here, "all federal–law claims are eliminated before trial, the

8    balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy,

9    convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the

10   remaining state–law claims."  *Id.* (citing *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7

11   (1988)).  Moreover, "state courts routinely handle assault, battery, and negligence claims against

12   police officers, and the similarity between the analyses for these state law claims and federal

13   claims does not mean that federal courts can or should exercise jurisdiction over these matters."

14   *Martinez v. City & Cnty. of San Francisco*, No. C–13–04197 DMR, 2014 WL 7387809, at *3

15   (N.D. Cal. Dec. 29, 2014).  Consistent with these principles, "many courts in this district have

16   dismissed or remanded state tort claims against officers when the federal claims have been

17   resolved."  *Gammage v. City of San Francisco*, No. 18-cv-05604-JCS, 2020 WL 1904498, at *15

18   (N.D. Cal. Apr. 17, 2020) (citing *Martinez*, 2014 WL 7387809, at *3).

19         Accordingly, Plaintiff's remaining state claim for violation of the Bane Act is

20   **DISMISSED** without prejudice to refiling in state court.

21   **IV.    CONCLUSION**

22         For the reasons discussed above, the Court **ORDERS** as follows:

23         1.   The Court **DISMISSES** without prejudice Plaintiff's third cause of action for

24              intentional infliction of emotional distress against all Defendants.

25         2.   The Court **DISMISSES** without prejudice all claims against Defendants Profio,

26

27   _____

     [6] The FAC contains two state law claims:  (1) violation of the Bane Act and (2) intentional

28   infliction of emotional distress.  Dkt. 23.  As discussed in section III.A. above, Plaintiff agreed to
     dismiss his claim for intentional infliction of emotional distress, so the Bane Act claim is the only
     remaining state law claim.

United States District Court
Northern District of California

1    Burnett, and Gaona.

2          3.   The Court **GRANTS** summary judgment in favor of Defendants Hatzenbuhler,

3               Orlando, and Jeffrey on the claim for violation of 42 U.S.C. § 1983.

4          4.   The Court declines to exercise supplemental jurisdiction over the remaining state

5               act claim for violation of the Bane Act and **DISMISSES** that claim without

6               prejudice to refiling in state court.

7          **SO ORDERED.**

8    Dated: July 7, 2023

9

10

11   SUSAN VAN KEULEN
     United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California